MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2021 ME 3
Docket:        SRP-20-13
Argued:        November 18, 2020
Decided:       January 14, 2021

Panel:         MEAD, GORMAN, JABAR, HUMPHREY, and CONNORS, JJ.

## STATE OF MAINE

v.

## ANTHONY S. LENG

CONNORS, J.

[¶1]  Anthony S. Leng appeals from his sentence after pleading guilty to the intentional and knowing murder of his wife.  *See* 17-A M.R.S. § 201(1)(A) (2020).  He argues that the sentencing court (Cumberland County, *Horton, J.*) misapplied the first step of the sentencing analysis required by statute, *see* 17-A M.R.S. § 1252-C (2018),[1] by not adequately comparing the circumstances of his crime to the circumstances of other defendants who had committed similar murders.  We affirm Leng's sentence.

---

[1]  In 2019, Maine's sentencing statutes were repealed and replaced.  *See* P.L. 2019, ch. 113, §§ A-1, A-2 (emergency, effective May 16, 2019).  Title 17-A M.R.S. § 1252-C (2018), which was in effect at the time of Leng's crime, was replaced by 17-A M.R.S. § 1602(1) (2020).  The differences between the statutes had no effect on the trial court's sentence or this appeal. *See State v. Treadway*, 2020 ME 127, ¶ 13 n.4, --- A.3d ---.

## I. BACKGROUND

[¶2]  The following undisputed facts are drawn from the State's summary of the evidence that it would have presented had the matter proceeded to trial. *See State v. Lord*, 2019 ME 82, ¶ 3, 208 A.3d 781; M.R.U. Crim. P. 11(b)(3), (e).

[¶3]  On January 7, 2018, shortly before 10:00 p.m., Leng and his wife arrived home after watching a football game at a friend's house.  Their ten- and fifteen-year-old sons were already home.  Almost immediately after Leng and his wife entered the kitchen, their younger son, who was in the living room, heard a single gunshot followed by more gunshots.  He heard his mother say "ah," believed he heard her fall to the floor, and heard his father crying.  He also smelled the odor of gun powder.  The younger son went into the kitchen where he saw his father standing by the refrigerator.  He then saw his mother lying on the floor next to blood and a gun, and he screamed.

[¶4]  The older son, who was upstairs getting ready to take a shower, heard his parents arrive home and then almost immediately heard a gunshot, a pause, and then more gunshots.  He ran downstairs where he saw his brother in the living room with his head buried in the couch.  The older son asked his father what he had done, to which Leng replied, "I just killed your mother."  The older son picked up his brother and ran outside.  Once outside, the older son

went to the door that led into the kitchen and looked through the window. He saw his mother lying on her stomach on the floor with her empty hands by her side and his father's gun on the floor near his mother. The older son called 9-1-1 and told the operator that his father had killed his mother and that he and his brother were hiding outside. He stayed on the line until police arrived, at which time both children ran barefoot to the police.

[¶5] After shooting his wife, Leng also called 9-1-1. He provided the address but answered no further questions and made wailing sounds. From the time the first 9-1-1 call was placed until his surrender to police, Leng remained alone in the house for fifteen minutes.

[¶6] When police entered the home, they found the victim lying on her right side on the kitchen floor. Her purse was still on her arm, and her keys were under her body. The victim had a knife in her right hand and eight other knives grouped around her head and on top of her hair. When the police found the handgun on the floor near the victim, the slide was in a locked back position, indicating that all of the ammunition in the gun had been spent, and a manually-activated red dot laser was in the on position. The police collected ten casings and ten bullets or bullet fragments, and they discovered multiple bullet holes less than six inches above the floor in the cabinet door next to the

victim's head. Shards from the cabinet door were found on the victim's hair and coat.

[¶7] The victim's autopsy revealed that she had died as a result of multiple gunshot wounds to her head and neck. Of significance, the medical examiner determined that one of the six shots that struck the victim had entered the right side of her face, which was the side facing the floor when police arrived and was the only wound that travelled in a "slightly right to left and downward" path. Based on the medical examiner's report, witnesses' reports of a pause between gunshots, and the physical evidence at the scene, police determined that the victim was first shot when she was in an upright position and then shot several more times after she had collapsed to the floor.

[¶8] On January 16, 2018, the State filed a complaint charging Leng with murdering his wife, to which he pleaded not guilty. In February 2018, Leng was indicted by the grand jury on one count of intentional and knowing murder, 17-A M.R.S. § 201(1)(A).

[¶9] In September 2019, after the State agreed to recommend a sentence not to exceed forty years in prison, Leng changed his plea to guilty. After

following the procedure prescribed in M.R.U. Crim. P. 11(b)-(e), the court accepted Leng's guilty plea.[2]

[¶10]   The court held a sentencing hearing three months later.   It considered the parties' oral arguments; the parties' written memoranda, which referenced sentences in seven other cases that either the State or Leng, or both, deemed comparable; a statement from Leng accepting responsibility for the murder and apologizing to his children; and several victim impact statements.[3]

[¶11]   With respect to the basic sentence, the parties differed markedly in their recommendations.   The State urged a basic sentence of sixty years' imprisonment, arguing that the presence of children during the murder would justify the imposition of a life sentence; Leng committed the "ultimate act of domestic violence" after years of threatening to kill the victim, just as she was preparing to leave him; and his staging of the crime scene to create the appearance that the victim was responsible for her own murder was

---

[2] During the Rule 11 hearing, the court asked Leng twice whether he understood that his sentence could range anywhere between the minimum mandatory sentence of twenty-five years' imprisonment to the agreed-upon "cap" of forty years, to which Leng repeatedly answered that he understood.  *See* M.R.U. Crim. P. 11(c)(1); 17-A M.R.S. § 1251(1) (2018).

[3] The adult daughter of Leng and the victim submitted a written letter to the court describing the physical and verbal abuse that Leng had inflicted on the daughter during her childhood.  The court referred to this letter at sentencing when discussing the effect that the victim's death had on her children.

6

particularly "cruel and callous." In contrast, Leng urged the court to set the basic sentence at thirty-five years' imprisonment, citing several comparable cases and arguing that "[t]his was not a life sentence case." The State and Leng recommended final sentences of forty years and thirty years, respectively.

[¶12] In pronouncing its sentence, the court began with the purposes of sentencing, drawing special attention to the goals of eliminating inequalities in sentencing by considering sentences imposed in similar cases, encouraging individualization of sentencing, and recognizing "domestic violence as a serious crime." 17-A M.R.S. § 1151 (2018).[4] The court also acknowledged that the minimum mandatory sentence for murder is twenty-five years' imprisonment and that the maximum sentence is life imprisonment, which, the court noted, could have been imposed here where the crime was the murder of a parent in the presence of that parent's children.

[¶13] After these remarks, the court set the basic sentence at fifty to fifty-five years. In formulating the basic sentence, the court took into consideration several factors: (1) the murder was a crime of domestic violence; (2) Leng's previous threats to kill the victim could be taken as evidence that he

---

[4] Title 17-A M.R.S. § 1151 (2018) was repealed and replaced with 17-A M.R.S. § 1501 (2020). P.L. 2019, ch. 113, §§ A-1, A-2.

had formulated the intent to murder the victim before that day; (3) Leng shot the victim several times, including after she had fallen to the floor; (4) the victim's children were not only present in the home at the time of the murder but saw their mother's lifeless body on the floor as they left the house in a panic; and (5) Leng staged the crime scene to make it appear as though he acted in self-defense, thereby casting blame on the victim for her own death. The court stated that in addition to the basic sentences in the cases presented by the parties, it also considered a case over which it had presided involving a conviction for domestic-violence-related murder in the presence of children in which the court had set the basic sentence at fifty to fifty-five years.

[¶14] After considering aggravating and mitigating factors, the court arrived at a final sentence of forty years in prison.[5] The court stated that although the forty-year sentence was "entirely appropriate in this case, the sentence in the absence of a plea agreement might have been more."

[¶15] Leng applied to the Sentence Review Panel, seeking leave to appeal from his sentence on the assertion that the court erred in setting the basic

---

[5] The court also ordered Leng to pay $5,100 to the Victims' Compensation Fund for reimbursement of the victim's funeral expenses.

sentence, leading to an excessive final sentence. The Panel granted his application. *See* M.R. App. P. 20; 15 M.R.S. §§ 2151-2153 (2020).

## II. DISCUSSION

[¶16] Leng argues that the court failed to conduct a proper comparison of the circumstances of his crime to similar murders. He asserts that the court's reliance upon a single case over which the court had presided is inadequate and does not serve the goal of consistency in sentencing.

## A. Standard of Review

[¶17] In a murder case, the sentencing court employs a two-step process. *State v. Hayden*, 2014 ME 31, ¶ 17, 86 A.3d 1221; 17-A M.R.S. §§ 1201(1)(A), 1252-C (2018).[6] "In the first step, the court determines the basic period of incarceration, and in the second, the maximum period of incarceration." *Hayden,* 2014 ME 31, ¶ 17, 86 A.3d 1221. We review the determination of the basic sentence for misapplication of legal principles and abuse of the court's sentencing power. *State v. Nichols*, 2013 ME 71, ¶ 13, 72 A.3d 503.

---

[6] Title 17-A M.R.S. § 1201(1)(A) (2018) was repealed and replaced by 17-A M.R.S. § 1602(2) (2020). P.L. 2019, ch. 113, §§ A-1, A-2.

B.    Comparable Cases

[¶18]  To determine the basic period of incarceration, a sentencing court considers "the particular nature and seriousness of the offense as committed by the offender."  17-A M.R.S. § 1252-C(1).  The court "examines the crime, the defendant's conduct in committing it, and looks at other sentences for similar offenses."  *Hayden*, 2014 ME 31, ¶ 18, 86 A.3d 1221 (alteration and quotation marks omitted).  Consideration of comparable sentences, however, is at the discretion of the court.  *Nichols*, 2013 ME 71, ¶¶ 16-20, 72 A.3d 503; *see also State v. Stanislaw*, 2013 ME 43, ¶ 21, 65 A.3d 1242 (stating that the court examines, at its discretion, other sentences for similar offenses); *State v. Basu*, 2005 ME 74, ¶ 23, 875 A.2d 686 (stating that the court *may* consider similar conduct of other offenders in deciding the basic sentence).  "[T]here may be times when appropriate case comparisons would advance the sentencing principle of eliminating significant unjustified inequalities in sentences," but "[t]he court has wide discretion in determining the sources and types of information to consider when imposing a sentence."  *State v. Reese*, 2010 ME 30, ¶ 28, 991 A.2d 806.

[¶19]  Leng's contention that the sentencing court relied on only one case is not supported by the record.  Although the court's commentary during this

part of the analysis was brief, the court expressly stated that it had considered the basic sentences in the cases presented by the parties as well as a similar case over which the court had presided. The court was *not* required, however, to conduct a comparison of Leng's case to similar cases at all—let alone provide an exhaustive enumeration of analogous cases—before setting the basic sentence. *See Nichols*, 2013 ME 71, ¶ 20, 72 A.3d 503 ("While it is permissible for the sentencing court to consider comparable sentences at the first step if appropriate, neither the statute nor our case law mandate it."). Thus, we find no error.

## C.    Sentencing

[¶20]  The term of imprisonment imposed for a conviction for murder can range from twenty-five years to life. 17-A M.R.S. § 1251 (2018).[7] "When a court imposes a basic sentence at or near the maximum, it does not misapply sentencing principles if it finds the defendant's conduct most serious as compared to other means of committing the crime within that same range." *Hayden*, 2014 ME 31, ¶ 18, 86 A.3d 1221 (alterations and quotation marks omitted).

---

[7]  Title 17-A M.R.S. § 1251 (2018) was repealed and replaced by 17-A M.R.S. § 1603 (2020). P.L. 2019, ch. 113, §§ A-1, A-2.

[¶21]  Here, the court properly considered the presence of the victim's children at the murder in setting the basic sentence at the higher end of the range.  In *State v. Waterman*, 2010 ME 45, ¶ 46, 995 A.2d 243, we observed that children exposed to violence are at risk of physical, neurological, psychological, and developmental harm.  Because of the "severe collateral impact on children," we stated that the presence of children at or close to the scene of a murder is "an aggravating circumstance that could raise a defendant's homicidal conduct to 'most serious.'"  *Id.* (quoting *State v. Hutchinson*, 2009 ME 44, ¶ 42, 969 A.2d 923).  We recently reaffirmed this principle in *State v. Weyland*, 2020 ME 129, ¶ 36, 240 A.3d 841, in which we concluded that "children witnessing 'horrific violence' exacted upon one parent by another is a significant factor in a sentencing decision."  *See also State v. Diana*, 2014 ME 45, ¶¶ 38-39, 89 A.3d 132; *Nichols*, 2013 ME 71, ¶ 28, 72 A.3d 503.

[¶22]  Next, the court appropriately recognized that the domestic violence nature of the murder was a factor to be given special consideration in sentencing. *See Nichols*, 2013 ME 71, ¶ 29, 72 A.3d 503 (concluding that murder committed as an act of domestic violence is "an objective factor properly considered in the first step of the sentencing analysis").  Effective two months before Leng murdered his wife, the Legislature amended 17-A M.R.S. § 1151,

establishing as a goal of sentencing "[t]o recognize domestic violence as a serious crime against the individual and society." P.L. 2017, ch. 105, § 3 (effective Nov. 1, 2017) (codified at 17-A M.R.S. § 1151(9) (2018)). Acknowledging the recent statutory amendment,[8] the sentencing court stated that it "intend[ed] to keep that particular goal of sentencing in mind as [it] proceeded with the analysis."

[¶23]  Finally, the court properly considered other factors in setting the basic sentence, including that Leng had threatened to kill his wife on numerous occasions before he murdered her, thereby demonstrating that he had formed the intent to commit murder at some earlier time, and that he had staged the crime scene to make the victim of his abuse appear to be the aggressor.

[¶24]   In sum, the court followed proper sentencing procedures, appropriately exercised its discretion in determining the sources and types of information to consider, and thoughtfully considered the relevant facts and sentencing principles in determining Leng's sentence.

The entry is:
Sentence affirmed.

---

[8]  Notably, several months after the murder occurred, the Legislature repealed and replaced 17-A M.R.S. § 1251, prescribing the length of a sentence for a murder conviction, to require courts to "assign special weight" when the victim was "a family or household member" and "a victim of domestic violence committed by the convicted person." P.L. 2017, ch. 374, § 1 (effective Aug. 1, 2018) (codified at 17-A M.R.S. § 1251(2)(C) (2018)).

James R. Gioia, Esq., Fairfield & Associates, P.A., Portland, and Peter J. Cyr, Esq. (orally), Law Offices of Peter J. Cyr, Portland, for appellant Anthony S. Leng

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2018-201
FOR CLERK REFERENCE ONLY